Case No. 145696, Pension Fund Group et al. v. Tempur Pedic International et al. Or arguments not to exceed 15 minutes per side. Mr. Jeffrey M. Johnson for the appellant. Good morning, Your Honor. Good morning, Mr. Johnson. I represent a group of pension funds that have brought this securities fraud class action against Tempur Pedic. And two of Tempur Pedic's top executive officers, the CEO, Mark Sarvery, and the CFO, Dale Williams. There's really, the appeal is about three issues, three of the elements of our securities fraud claim. The materiality of the undisclosed statements that really form the heart of our case. So materiality, whether those statements were misleading or incomplete. So sort of the false statement, falsity of the statement itself. And then scienter, which the district court didn't reach but has been raised as another reason for why the court can affirm. So on materiality. The court didn't reach that scienter because? Because they found that the statements were not material and were not affirmatively misleading. So on materiality, just to start. Tempur Pedic is a company that makes memory foam mattresses that sell for between $2,000 and $3,000 each. Between 2008 and 2011, they really were the only game in town when it came to memory foam mattresses. They just completely dominated the market. But at the beginning of 2011, one of their top competitors, Serta, introduced its own memory foam mattress called the iComfort. That sold for between $800 and $1,200. So throughout 2011, investors were really focused in on was Tempur Pedic going to be able to continue to dominate this memory foam market? And in August and September of 2011, the CEO and CFO had key pieces, material pieces of undisclosed information going directly to the Serta competition issue. The first piece of key information they had is that they had all of their regional sales managers look at the mid-level stores where Serta and Tempur Pedic were competing head-to-head. And they performed an internal risk analysis of iComfort accounts that was specifically sent to the CEO. And basically what the risk analysis, and the risk analysis was attached as Exhibit A. We have the document. It was attached as Exhibit A to our amended complaint. The risk analysis shows that in stores where Tempur Pedic and Serta were going head-to-head, Tempur Pedic's sales growth was being completely decimated. But there was still, as I recall looking at this, even though in those stores where it was being sold, the profitability of Tempur Pedic went down to in the single digits as opposed to in the double digits for other areas, there was still some growth. And in the statements, the CEOs mentioned that there was heavy competition. And while they hoped to continue to be able to be profitable and to grow, that there were some serious challenges. So what about that under the standard makes it materially misleading? I think it's helpful not to think about the elements kind of separately because they do kind of come together. But on the materiality, the standard for materiality under the law, and it goes back to Basic v. Levinson's Supreme Court case on this, is that information is material if it significantly alters the total mix of information available to investors. And on a motion to dismiss, materiality typically is a fact-based question. But if it's corporate puffery, then it's not. Right. Well, that goes to the statement. I know. So you want me to jump to the statement? No, I don't. I want you to go the way you want to go. I mean, on materiality, on a motion to dismiss, the standard is, was the information so obviously unimportant that reasonable minds couldn't differ on its importance? And a 30% cut in sales growth in stores where you're competing head-to-head absolutely is highly material information. A period of how long? That was from when the products were introduced in April in these mid-level stores. You have this new product to compete for the first time. I'm not recalling what time frame you used to talk about the materiality. Well, the materiality. The sales numbers for a year or two? No, it's for four months. Thank you. It's four months of sales where your sales are being cut 30%. There's a second piece of material information, too. But isn't that important, counsel, that this was a short window of time where the introduction? I mean, would a reasonable investor go, oh, my goodness, you didn't tell us about those four months? Absolutely, because Tempur-Pedic has one product, essentially, the memory foam mattress. When the information did come out in 2012, the stock dropped 72%. I mean, the fact that your sales growth is being cut 30% in stores. Did it stay? I mean, that drop in the price of the stock, did that maintain? Was there, like, a bounce back during the night? I'm not sure. Yeah, how much of a bounce back did it? I take it there was one. There typically is. I don't know that one way or the other. I mean, it dropped 20% on one of the corrective disclosures and 50% on the other. So it was a significant drop. But, I mean, Tempur-Pedic is the only game in town. The fact that you're experiencing a 30% sales drop, I think, is absolutely material. Investors wanted to know that. They also wanted to know the second piece, which is starting in January 2012, the four of the largest retailers were going to start selling the iComfort. And that represented 30% of their sales. So those are the two key pieces of information that they didn't disclose.  Because the security laws are very clear that you don't have an obligation to disclose material, not public information. Where would you say, counsel, because this is a pretty dense record and the numbers matter, where would you point to say Judge Caldwell went off the rails in analyzing this? She went off the rails in two ways. First, when she said that the information wasn't material. So you want to focus. Right. And then a second, she went off the rails when she found that the defendants didn't have a duty to disclose. And I think the security laws say that when you, this is very clear, when you speak on a particular topic. Judge Caldwell never said that you don't have a duty to disclose. She said, here, there wasn't a duty. And where particularly did she, what did she miss in that analysis? She missed the fact that the executives spoke affirmatively on competition. Right. So, and those are not forward-looking statements. In the Rick's disclosures themselves, they made statements about CERDA competition. They said CERDA has introduced a competing product that could potentially impact our sales. That opened the door to talking. So they ought to have said more. They should have said that in stores where we're going head-to-head, we've seen our sales growth cut 30 percent. And that starting January 2012, our four of our largest retailers, representing 30 percent of our sales, are going to start selling the iComfort. And I think this is really. This is what they knew, and they ought to have spoken it because it's the recent, it's the recent. I'll call four months recent. Right. Well, and by January 12th, we've got, you know, four additional months, September. And we have internal documents showing that Sarvery, the CEO, was tracking it on a weekly basis because Exhibit 2, I don't know if it's Exhibit 2 or these e-mails, these weekly top 30 reports, and it's bold in September, Sarvery's going to start looking at these. But I think. But, you know, they also, they do talk about the new entrants in the market, Sealy, CERDA, Simmons, and others. Right. But they say that a number of our significant competitors offer these mattresses, and any such competition by these manufacturers or new entrants into the market could have a material adverse effect on our business financial condition and operating results. Do they have to put in their numbers and percentages? I mean, if you say that it could have a material adverse, I mean, are these companies required to paint the darkest, deepest projections? Aren't they entitled to disclose but also offer hope? I think there are two key points here, okay? Okay. One is that defendants, and I think the district court judge got this wrong too, materiality is not limited to information that has a material impact on your financials. I mean, it eventually did. But materiality is a much larger scope of information, and the impact that it was having in the mid-level stores, the 30 mid-level stores where they're going head-to-head, that can be material even if it isn't having a material impact on your financials. So that's the first point. But then on the duty, which I haven't really addressed much, the duty, there's a real problem with defendants' argument on the duty. On the one hand, they did speak affirmatively on competition, right? The points that you're talking about, okay? But when you're talking about the affirmative statements on competition, defendants say, oh, but that was just general corporate puffery, right? The affirmative statements on competition weren't specific enough to trigger a duty to provide these additional information on competition, okay? But then when it comes to our forward-looking statements, right, the projections on the earnings per share and the sales, they need to have meaningful cautionary statements, right? But on the meaningful cautionary statements, they flip back and completely reverse course and say, oh, our cautionary statements on competition were highly specific and highly detailed and give us the safe harbor. There's no way to reconcile those two positions. Either of the statements were, you know, if they were so specific, then they would have, on competition, they triggered the additional duty to provide the internal information. Back story. Right. And so I just, there's no way to reconcile that position. Our position is completely reconcilable. We said they spoke on competition, but those statements were misleading because they were incomplete. They didn't provide these additional facts, and they don't get a meaningful, they don't get safe harbor because there were no meaningful cautionary statements, again, because the statements on competition were incomplete and inaccurate. So there's, I think that's the thing the district court judge missed. And if I could just spend the last three minutes on scienter, because I think that there's, defendants, again, really misconstrued the scienter standard. Again, the statements that we have, the affirmative statements we have, we've got both affirmative statements on competition and we've got forward-looking statements, right? The affirmative statements on competition, we only have to show recklessness, reckless disregard for the truth. On the forward-looking statements, we have to show actual knowledge. But we can show, absolutely show actual knowledge here. We've got the internal documents, we've got the emails, and we've got tons of additional information. And defendants want to say that, oh, but you need to have a smoking gun document where defendants are saying we engaged in securities fraud. But that's not the standard. We have a smoking gun document that shows that they were aware of the underlying facts that rendered the affirmative statements. And when you say the particular underlying facts is in the 30 stores. Right. There's three. Mid-level stores. The 30 mid-level stores where they're going head-to-head, their sales growth was just getting destroyed. It was 33 versus 3. And those earnings projections were based on earnings growth, yearly earnings growth in the high 20s. So that's significant. The fact that the four largest retailers were going to start rolling it out. And then 35 of the 40 mid-cap stores actually had seen their sales go down. I mean, it wasn't just a decline in sales growth, that was overall. I mean, it was just a tiny sales growth because I think five of the stores still were growing. But 25 of the 30 stores, it was going down. But going back to SciEnter, all of the factors really cut in our favor on SciEnter. We've got internal documents. We've got Sarvery monitoring the sales data in real time. We've got super close proximity between the false statements in January and April and the corrective disclosure in June. We've got this fact that this was their core business. This is what they did. We've got heavy insider selling from the CFO. He sold $4.2 million worth of stock. And what defendants want to do is go through each of those piecemeal. But the law is absolutely clear that you have to consider all of the evidence on SciEnter in totality. And just the final point I want to make here is that defendants come back with a non-fraud-based explanation. And this goes to the Supreme Court's Taleb case, where you need to weigh the fraud-based explanations versus the non-fraud-based explanation. And a tie goes to the plaintiffs. We have to show an explanation that's equally as compelling. Their explanation is that the SIRDA competition just completely dropped out of the sky over the Memorial Day weekend. That doesn't square with the actual internal documents. We know that the competition issue was happening the latter half of 2011. This was a storm that was brewing. And the knowledge of that. And the knowledge of that. And so their explanation is not compelling. This was something that was in the works. It's something that investors absolutely wanted to know. SIRDA makes memory foam mattresses. I'm sorry. Tempur-Pedic makes memory foam mattresses. And the fact that SIRDA was moving into that market was just a huge deal. So, Your Honor, I think the district court's opinion was in error. It's a de novo standard of review. We ask that you reverse and remand back to the district court. Thank you. And, counsel, is this the end of all your time? I have two minutes to rebuttal. All right. We'll await that argument. You may proceed. Thank you. Your Honor, Jordan Hirschman for the defendants. I want to start out by saying that the district court correctly threw out this case because the facts alleged are the opposite of securities fraud. The facts alleged show that this company did everything right. So what do I mean by that? What I mean is, in the year 2011, they accurately reported their historical results. There is no allegation. I mean, you just heard counsel being rather exercised about how it wasn't adequate. The disclosures were incomplete. So they never did talk about these sales numbers. I mean, your overarching argument, I understand, is they did everything right. So how about addressing why it was? Counsel makes a good argument that it was misleading on one hand, and your argument the other, that we disclosed everything later, makes it right. Okay, and the plaintiff's appellants are ignoring the law. The law is that the safe harbor for forward-looking statements applies to the statements he's challenging. There was, on the one hand, accurate disclosures not challenged. I thought he was griping about your cautionary language being inadequate. And I guess on that point I'll just jump directly to, I direct the court to Miller v. Champion, this court's ruling in 2003 squarely on that point. And on that point, in that case, there was the exact same kind of allegation that was made, that the cautionary language wasn't specific enough. And there, Miller was in the business of selling mobile homes, and it said that there was excess inventory building up, just like Tempur-Pedic here said, we have competition specifically from CERTA, specifically releasing a new mattress that can affect our results going forward. They did not affect our results in 2011. We had record results in 2011, notwithstanding everything they've alleged that was known. The company had record results in 2011. So this report he's talking about from September of 2011, Tempur-Pedic had record sales in first, second, third, fourth quarter of 2011, the year of 2011, and the first quarter of 2012. The stock drop of 70 percent was triggered by what? The stock drop was triggered by, in the middle of the year, 2012, Tempur-Pedic did just what Congress wants it to do. When it first learned that it was likely not to achieve its sales projections, it announced that its revenue projection was going to revise it downward by 10 percent. That's what this entire case is about. It's not about a financial disaster, a bankruptcy, a restatement of financial results, saying anything factual that was inaccurate. It's about a company making a projection at the beginning of the year about what its sales will be for the entire year, after having record sales in the prior year, then having record sales in the first quarter. Okay, counsel, I want to ask you about one of the other points that the appellant raised about what Tempur-Pedic said when it said it and what it knew when it said it. He says that the corporate officers made statements at a point in time, such as, our customers prefer our products. We have strong incentives for retailers not to carry competing product lines. But at the time they were making those statements, didn't Tempur-Pedic at that time already know that these other interests were coming into the market and that they were going to be selling these competing products? So Tempur-Pedic was making these statements somewhat optimistically when they had information that directly contradicted that. In fact, some of the sales were already starting. Isn't that true? No. The statements that were made, first of all, the ones that you alluded to, are immaterial as a matter of law because they are vague and indefinite statements. But even when you consider what it was that was known about their sales and eye comfort, nothing that had happened so far, through the point that the statements were made, had prevented Tempur-Pedic from actually achieving record sales results. But we have a statement, we have strong incentives for retailers not to carry competing product lines when in fact the competitors were already engaging in selling those product lines. How can you say that's vague and indefinite? Well, because, first of all, the company itself specifically affirmatively stated that its competitors' products were being sold in other stores and had been released. And I want to specifically refer to the company's disclosure, quote, during the past several years, a number of our competitors, including Sealy, Serta, specifically Serta, and Simmons, have offered viscoelastic mattress products and pillow products, including several new product introductions in 2011. So the company wasn't saying our competitors' products aren't being sold in stores. It was affirmatively saying the exact opposite, and it was public information. It was no secret that Serta's products, including its eye comfort product, were sold in the marketplace. And our Tempur-Pedic was specifically warning investors about the possibility that competition from those competitive products might cause the company not to achieve its sales projections. And it was only off by 10 percent. And I know we can argue about this, but they were also telling those same investors, don't worry about it. Our competitors are not really going to carry these things. We're okay. Just stay the course. Well, with all due respect, Your Honor, I don't think that that's – read in context, I don't think that's what was being said. The company was affirming – it's no secret that Tempur-Pedic is a mattress manufacturer and it faces competition from Serta and Sealy and Simmons, and that those companies were specifically offering new viscoelastic products, and Tempur-Pedic specifically disclosed that they were. And on those very same calls, you'll see discussions about that competition. So there was nothing secret about that. It was completely disclosed. I mean, the difference here is I would simply invite the court to compare the fact pattern, in this case, to Miller v. Champion on the one hand and Hellwig v. Vencore on the other hand. That's all you have to do, because what you're going to see – like, getting back to the language that I was talking about from Miller v. Champion, in Miller v. Champion, the same argument was made. You didn't say enough. You didn't say enough. Yes, you warned about it, but you didn't give this additional specific fact. And what the Sixth Circuit said there is, that goes too far. Champion disclosed the exact risk that occurred in this situation, excess inventory that could lead to negative economic effects on Champion. Champion is not required to detail every facet or extent of that risk to have adequately disclosed the nature of the risk. And that's exactly the situation here. Tempur-Pedic disclosed specifically CERDA has a competitive product, and we may not achieve our sales projections as a consequence of that, among many other risks that we're facing. That's exactly the fact pattern of Miller v. Champion. Now, on the other hand, you have Hellwig v. Vencore. In that case, the risk had, in fact, materialized. In that case, you had the passage of the Balanced Budget Act, a company that knew it was already having negative consequences in a big way on the company, and had said to its employees, we are going to lay you off, tough times are ahead, and then publicly said the opposite, the opposite, which is, we don't know what effect this is going to have. And there was discretionary stock trading. There's no discretionary stock trading here. There's only Rule 10b-5-1 trading, which has nothing whatsoever to do with the state of mind of any one of these defendants. And the other thing that's critical to keep in mind here is that under Miller v. Champion, and under the PSLRA, when the first prong of the safe harbor applies, then you do not reach the question of state of mind at all. It's an absolute bar to a claim, an absolute bar. When forward-looking statements are accompanied by meaningful cautionary language, and the language here is unquestionably meaningful, it warns of the exact risk that materialized. I think the heart of counsel's argument is words like could have. And it seems that the appellant says, gee, you knew enough that you should have said will have. Okay, and here's my response. Should have said. Right. And my response to that, Your Honor, is the following. And I am relying here on facts alleged. And in Miller, was it a could have? Yes. Sure, same thing. Yes. And my response to that is the following. We're talking about do these people have a good-faith belief for making a projection of a year's worth of sales results, which obviously they don't have a crystal ball. They could be wrong. Why was it reasonable? Because notwithstanding everything that they knew, notwithstanding everything that's alleged, in the year 2011, when these September slides were in existence, they were doing sales of literally 28% sales growth for the entire year of 2011, notwithstanding iComfort being released, notwithstanding this report. Now, in the first quarter of 2012, he says, well, you knew four of your ten retailers were going to be selling iComfort. Well, in the first quarter of 2012, they were. And Tempur-Pedic did 18% sales growth over the first quarter of the prior year, record sales growth. So notwithstanding everything regarding iComfort that's being alleged in this complaint, through the point at which they, in the middle of a quarter, in the middle, they didn't even have a duty to do it. As soon as they came to a conclusion, we think our guidance is likely not to be achieved. For the first time that they came upon that information, they came to the market and they corrected the guidance. You realize this from the briefing as well as we do. That's really where I think you and your brother counsel differ. He speaks of all the information that was going on in the corporate headquarters and with the CEO and CFO, that there ought to have been earlier information because there was specific knowledge at the home office. And the response is, their allegations regarding, you don't even reach the question of actual knowledge because the first prong of the safe harbor applies. And even if you did. The first prong of the safe harbor being the cautionary language was fine. Yes. And even if you reach the second prong, which only applies when there isn't meaningful cautionary language that accompanies the challenge statement, their allegations of actual knowledge are woefully defective. And so if you actually look at the documents he's referencing, you will see that none of those documents say what he's saying. There are emails that don't actually say, this is what our sales have been, these top 30 reports. Check the documents. You're not going to see any specific information in those documents. The only document that they're referring to is the September slide, September of 2011. And what I'm explaining to you is. . . The serious focus by the CFO, I think, that he's monitoring the numbers, he's watching them closely, these sort of things. And again, what I'm saying is, under the law that applies to a case like this, generalized allegations to documents with no specifics regarding what the documents actually say cannot. . . And the import of that, what they say? Oh, you just say the shortfall is not telling the court what they say? I'm saying that the documents that are alluded to in this. . . The burden is on the plaintiff appellant to point to documents that actually gave to the defendant's actual knowledge that the projections were false when made. And that if you look at the documents that he's referring to, these documents about tracking sales, there aren't any documents that are put before this court that actually contain any numbers at all. They're simply saying that senior officers of the company had access to reports. Under this court's ruling last year in the Omnicare case, which we cite, those kinds of allegations are patently defective under the PSLRA to give rise to allegations of actual knowledge. So the only specific documents that are pointed to are the September slides. And what I'm explaining to the court is that in the face of that, those results, those results in a small number of the company's stores, a small number, this is a huge company, in a small number of the stores, those results, notwithstanding those results, didn't prevent the company from blowing away its sales projections for the year 2011 and having record results and record results in the first quarter of 2012. He also complains, and I realize I'm backing up now, but he also complains about the information in your Form 10-K where you talk about the potential risk of competition. And he says that you're minimizing, if not being inaccurate, because the competition was already ongoing and that you expressed an actuality as a potentiality. That's one of the other things. And again, the company plainly states, we face all kinds of competition now. If you look at what the company actually says, not the mischaracterizations of what the company says, you'll see the company flat out says, we do face this competition. Look, let me put it to you this way. The company had 28 percent sales growth in the year 2011, record sales growth. In 2012, when it gave its guidance, the guidance it gave was 14 to 18 percent, lower than the growth that was achieved the year before. It did its best. It's consistent with analyzing the marketplace, taking into account the challenges it's facing, and then says, this is our best estimate of what we think we're going to do. It ended up only being off by 10 percent. They don't have a crystal ball. Thank you. I appreciate your argument. Thank you. Your Honor, I just want to address three quick points. The first is Champion. And your point, Judge Cook, is just absolutely spot on. Champion was a could-have case. And what that is really is it's the distinction between hard info and soft info that runs throughout this Court's jurisprudence. Hard info is historical, objectively verifiable info, which is what we have here. We have, and by the way, Your Honor, I got the numbers a little wrong on your question on how much data do they have. The product was introduced in the middle of the stores in April 2011. The CEO got nervous in September 2011. So we've got six months of historical data that's in the internal risk assessment report, which has actual numbers. It's attached to our complaint Exhibit A. I'd encourage you to look at that. The false statements happened in January 2012. We've got 10 months of historical data, and we know that the CEO continued to monitor it on a weekly basis during that additional 10 months. Make your points because we have that. By the final false statement is April 2012. We've got a whole year worth of data. In Champion, that was a projection case. They disclosed they had detailed disclosures on inventory buildup, right? But the stuff that the plaintiffs are complaining about is that one of their main retailers eventually went bankrupt, and they said you should have told investors that they went bankrupt. Well, the Court said they had no information to know that the retailer was going to go bankrupt. And besides, that's a soft information case. Helwig, which is a very helpful case for us, is also a soft information case. And the Court there said that there wasn't a duty to disclose the underlying information. That was a case involving the Balanced Budget Act. And if that was passed, that would have totally wiped out the company's sales. The only hard information case in this circuit is the City of Monroe v. Bridgestone case, which is probably the case that's most on point. There, the company made disclosures, affirmative disclosures, saying that's the tire, the tire case, firesome tires, the separation of the tread. The company said we monitor the safety of our tires, and our tires are safe, even though they had internal reports showing that for a certain small percentage of their tires, I think 12% of the tires, there was separation of tread. Well, that's hard information. Just like the sales data, by the time they made the April statement in 2012, they had a year's worth of same-store sales data. And we have actual, this is just remarkable in a securities fraud case, to have actual internal documentation that was provided to the CEO showing the material information that you're complaining about in your case. And we can't take discovery until we beat the motion to dismiss. And we also have e-mails showing that he was monitoring it on a weekly basis because it says in bold. Yes, got the point. Right. I mean, it's a rest. We have the point, but I think you're saying the same point. Yeah, you're right. I think we have it. Okay. And both of you have done a good job for your clients. We appreciate your help. We'll do our best to sort out your case and issue an opinion in due course. All right. Thank you.